IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DARREN D. KLEIN,                                              No. 3:15-cv-00179-HZ

                        Plaintiff,

        v.

CAROLYN W. COLVIN,                                   OPINION & ORDER
Acting Commissioner of Social Security,

                        Defendant.


Karen Stolzberg
11830 S.W. Kerry Parkway, #315
Lake Oswego, Oregon 97035

        Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Janice E. Hebert
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902


1 - OPINION & ORDER

Thomas M. Elsberry
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiff Darren Klein brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I affirm the Commissioner's decision.

## PROCEDURAL BACKGROUND

     Plaintiff applied for DIB and SSI on April 29, 2011, alleging an onset date of November 11, 2007, which he later amended to March 3, 2011. Tr. 206-18, 57. His applications were denied initially and on reconsideration. Tr. 90-102, 116, 118, 150-53 (DIB Initial); 103-15, 117, 118, 154-57 (SSI Initial); 119-32, 147, 149, 161-62 (DIB Reconsideration); 133-46, 148, 163-64 (SSI Reconsideration).

     On June 14, 2013, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 49-89. On June 27, 2013, the ALJ found Plaintiff not disabled. Tr. 25-47. The Appeals Council denied review. Tr. 8-14.

## FACTUAL BACKGROUND

     Plaintiff alleges disability based on having "Adhd," double hip replacements, "4 screws in neck," back surgery, and left arm surgery. Tr. 245. At the time of the hearing, he was forty-five

years old.  Tr. 34, 52.  He is a high school graduate and completed trade school programs at

Western Culinary Institute and Elite Truck Driving School.  Tr. 54-55.  He has past relevant

work experience as a tractor trailer driver, bus driver, drywall finisher, and cleaning machine

tender for semi-conductors.  Tr. 39.

### SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which . . . has lasted or can be

expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§

423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  See Valentine v.

Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step

procedure to determine disability).   The claimant bears the ultimate burden of proving disability.

Id.

In the first step, the Commissioner determines whether a claimant is engaged in

"substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S.

137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner

determines whether the claimant has a "medically severe impairment or combination of

impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the

claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in

combination, meet or equal "one of a number of listed impairments that the [Commissioner]

acknowledges are so severe as to preclude substantial gainful activity."  Yuckert, 482 U.S. at

141; 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed

disabled; if not, the Commissioner proceeds to step four.  <u>Yuckert</u>, 482 U.S. at 141.

     In step four, the Commissioner determines whether the claimant, despite any

impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20

C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, the claimant is not disabled.  If the

claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five,

the Commissioner must establish that the claimant can perform other work.  <u>Yuckert</u>, 482 U.S. at

141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden

and proves that the claimant is able to perform other work which exists in the national economy,

the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

     At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity since his alleged onset date.  Tr. 30.  Next, at step two, the ALJ determined that Plaintiff

has severe impairments of (1) degenerative disk disease of the lumbar spine, status post

diskectomy at L4-5 and L5-S1 with radiculopathy; (2) status post total hip replacement, bilateral;

(3) status post cervical fusion at C5-6; and (4) obesity.  <u>Id</u>.  However, at step three, the ALJ

determined that the impairments did not meet or equal, either singly or in combination, a listed

impairment.  Tr. 33-34.

     At step four, the ALJ concluded that Plaintiff has the residual functional capacity (RFC)

to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b).  Tr. 34.  Specifically,

the ALJ found that Plaintiff

     can lift and/or carry 20 pounds occasionally and 10 pounds frequently.  He can sit

for six hours in an eight-hour workday. He can stand and/or walk for six hours. He can frequently kneel, crouch, or crawl. He can occasionally stoop or climb ramps, or stairs. He can never climb ropes, ladders, or scaffolds. He must avoid jobs that require excellent bilateral hearing because of a decrease [in hearing] in his right ear. He must also avoid concentrated exposure to extreme cold, vibrations, and workplace hazards, such as heavy equipment and unprotected heights.

Id.

With this RFC, the ALJ determined that Plaintiff was able to perform his past relevant work as a semi-conductor cleaning machine tender. Tr. 39-40. Alternatively, the ALJ continued to step five and concluded that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as small products assembly, laundry folder, storage rental clerk, surveillance system monitor, addresser, and charge account clerk. Tr. 41. Thus, the ALJ determined that Plaintiff is not disabled. Id.

STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." Vasquez, 572 F.3d at 591 (internal quotation marks and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149,

5 - OPINION & ORDER

1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

DISCUSSION

Plaintiff argues that the ALJ erred by (1) failing to give controlling weight to the opinions of treating doctors; (2) finding Plaintiff not entirely credible; (3) failing to properly consider if Plaintiff's conditions met Listing 1.04 at step three; (4) failing to properly consider the impact of Plaintiff's obesity; and (5) failing to give appropriate weight to lay witnesses. As a result of these errors, Plaintiff argues that the ALJ's RFC was inadequate.

I. Medical Evidence

A. The ALJ's Decision & Medical Evidence in the Record

In addition to the medical evidence of the three treating physicians discussed below, the ALJ discussed the medical evidence relating to (1) a July 2011 examination by Physician's Assistant (PA) Barry Jacoshenk at the Orthopedic and Sports Medicine Center of Oregon; Tr. 358-59; (2) an August 2011 examination by orthopedist Dr. Stephen Thomas, M.D.; Tr. 404-07; and (3) a December 2011 bunionectomy; Tr. 517-40;

About four months after his alleged onset date, Plaintiff was seen by PA Jacoshenk. Tr. 358. The problem noted was a "recheck" of the "right hip." Id. Plaintiff reported that a podiatrist had told him he had "lost an entire inch" on his right side, and suggested this was caused by his hip surgery. Id. Plaintiff reported that he had been doing pool therapy which had been helping, and he complained of back pain caused, he thought, by the leg length discrepancy. Id. X-rays showed that his left leg was only "slightly longer" than his right, by just one centimeter. Id. X-rays also showed some degenerative changes to his lower spine, to a mild to

6 - OPINION & ORDER

moderate degree, as well as to the facet joints.  Id.  On physical examination, his hips were fine, there was no muscle atrophy, he had a non-antalgic gait, and intact neurovascular supply to the right lower extremity.  Id.  Although he had a positive seated straight leg raise, the issue did "not appear to be coming from his hips, as his x-rays and exam are negative."  Id.  PA Jacoshenk thought that low back issues were causing some radiculopathy.  Id.  There was no further treatment he recommended at that time.  Id.  He noted that Plaintiff might benefit from some physical therapy, but, he thought it "more appropriate" to wait because Plaintiff was to be evaluated by his surgeon Dr. Oisin O'Neill, M.D., in about a month anyway.  Id.

The ALJ discussed the opinion of examining orthopedic specialist Dr. Stephen J. Thomas, M.D.  Tr. 35, 36.  Dr. Thomas examined Plaintiff on August 16, 2011.  Tr. 404-07.  At that time, Plaintiff reported to Dr. Thomas that he experienced low back pain, that he could stand for 20 minutes, could walk one-half of a block, could squat only with difficulty, could lift up to 25 pounds, but avoided lifting over 20 pounds, could sit for a couple of hours, and could do small things around the house.  Tr. 405.  On physical examination, Dr. Thomas found that Plaintiff sat comfortably but was slow to get up.  Tr. 406.  He walked without a limp, was unable to walk on his toes, and had squat and rise ability of only 50% of normal.  Id.  He assessed the degree of Plaintiff's lumbar and cervical flexion, extension, and bending.  Id.  Dr. Thomas noted that Plaintiff had decreased sensation to part of his right foot.  Id.  He was unable to perform a sit-up. Id. He also had pain to palpation in the midline from L3-S1.  Id.  Plaintiff had slight pain to palpation at the base of his neck posteriorly but no pain over the trapezius or rhomboid.  Id.  He had 5/5 strength in his biceps and triceps, with grip strength at 13 ppsi bilaterally.  Id.

Dr. Thomas reviewed Plaintiff's recent MRI and noted that there was multilevel

7 - OPINION & ORDER

degenerative disk disease with a very narrowed disk and nerve root protrusion at L2-3.  Id.  His

hip x-rays showed the hip replacements in good position.  Id.  Dr. Thomas assessed Plaintiff as

having degenerative disk disease of the lumbar spine, status post diskectomy at L4-5 and L5-S1

with current radiculopathy, as well as status post total bilateral hip replacement and cervical C5-6

fusion.  Tr. 407.

Dr. Thomas opined that due to his hip replacements, Plaintiff should not stand or walk for

over a short time or distance.  Id.  He recommended further evaluation by Dr. O'Neill to

determine if surgical intervention was needed for the lumbar spine.  Id.[1]  Dr. Thomas further

opined that Plaintiff could not walk over 2 blocks, but that he could sit for approximately 2 hours

at a time.  Id.  Further, he could not lift or carry over 20 pounds, he could travel short distances,

and he could handle small objects but not large ones.  Id.  Plaintiff told Dr. Thomas that he was

not decided about his future but that he needed to go back to work to be trained for a sedentary

job.  Id.  Dr. Thomas said that this "would be appropriate."  Id.

The ALJ summarized Dr. Thomas's report and then gave his opinion "significant weight."

Tr. 35, 36.  The ALJ explained that Dr. Thomas was a specialist in the field, conducted a

thorough examination, and his opinions were consistent with the objective medical evidence.  Tr.

36.

On December 6, 2011, Plaintiff had a bunionectomy on his right foot.  Tr. 517-40.  At his

post-operative visit, he reported minimal pain and felt his foot had significantly improved.  Tr.

517.  He inquired about returning to normal shoes and going fishing in two weeks.  Id.  He was

---

[1] As discussed below, Dr. O'Neill performed lumbar decompression foraminotomies in
October 2011 after which Plaintiff did well with complete resolution of leg pain.

told he could resume outdoor sports in one month, but he could try a regular shoe immediately. Id.

On October 12, 2012, Plaintiff returned to see PA Jacoshenk, complaining of new left hip pain. Tr. 560. On physical examination, there was some tenderness, but he walked with a non-antalgic gait and his hip motion was good. Id. He experienced some lateral pain when getting in and out of a chair, but push-pull caused no discomfort. Id. His neurovascular supply was intact. Id. His hip x-rays showed his hip replacements to be in satisfactory alignment with no evidence of any loosening or wear. Id. PA Jacoshenk diagnosed Plaintiff with left trochanteric bursitis. Id. He reassured Plaintiff that "his hip is not the issue." Id. He recommended physical therapy. Id.

The record also shows that nerve conduction studies performed after Plaintiff complained in June 2012 about numbness in his hands, were positive for mild bilateral carpal tunnel syndrome, worse on the left than right, but were negative for left or right ulnar neuropathy and negative for cervical radiculopathy involving the right or left upper extremities. Tr. 544-46, 553-55.

B. Treating Physician's Opinions

Social security law recognizes three types of physicians: (1) treating, (2) examining, and (3) nonexamining. Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant. Id.; 20 C.F.R. §§ 1527(c)(1)-(2), 416.927(c)(1)-(2).

If the treating physician's medical opinion is supported by medically acceptable

9 - OPINION & ORDER

diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. Orn, 495 F.3d at 631; Holohan, 246 F.3d at 1202. If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. §§ 1527(d)(2), 416.927(d)(2). Orn, 495 F.3d at 631.

If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons. Id. at 632. Even if the treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" which are supported by substantial evidence in the record. Id.

1. Dr. Thomas Schrattenholzer, M.D.

Beginning sometime in 2008, Plaintiff occasionally saw Dr. Schrattenholzer for pain management. Tr. 369-403 (showing visits in March 2008, August 2009, March 2010, April 2010, June 2011, August 2011); Tr. 591-97 (showing visit in August 2012). In addition to managing his pain medications, Dr. Schrattenholzer twice administered epidural steroid injections. Tr. 389 (Aug. 2009, cervical spine); Tr. 401 (Aug. 2011, lumbar spine).

On August 7, 2012, Dr. Schrattenholzer completed a Medical Source Statement regarding the nature and severity of Plaintiff's physical impairments. Tr. 556-59. There, he described that Plaintiff's primary symptoms were neck pain and numbness into both arms, low back pain, and hip pain. Tr. 556. He indicated that Plaintiff had lumbar and cervical degenerative disc disease and hip osteoarthritis. Id. He reported that he had been unable to completely relieve Plaintiff's

pain with medication without unacceptable side effects.  Id.

He opined that in an 8-hour day, Plaintiff could sit for 4 hours, could stand/walk for 0-2 hours, could occasionally lift and carry less than 10 pounds, could rarely lift and carry 10 or 20 pounds, and could never lift and carry 50 pounds.  Tr. 556-57.  He stated that Plaintiff had significant limitations in repetitive reaching, handling, fingering, or lifting, that Plaintiff's condition interfered with his ability to keep his neck in a constant position, and that Plaintiff should engage in no stooping, pushing, kneeling, pulling, or bending.  Tr. 557-58.  He acknowledged that Plaintiff did not need a cane or other assistive device while engaging in occasional walking or standing.  Tr. 557.  He concluded that Plaintiff could not do a full-time competitive job that required activity on a sustained basis.  Id.  Finally, he opined that Plaintiff would likely be absent from work as a result of his impairments more than three times per month. Tr. 559.

In August 2012, Plaintiff complained of increasing low back and leg pain to Dr. Schrattenholzer.  Tr. 595-97.  He also described worsening neck pain.  Tr. 595.  Dr. Schrattenholzer noted Plaintiff's muscle pain and joint pain, and some numbness, tingling, and muscle weakness.  Tr. 595.  However, he also found that Plaintiff was in no distress, was not writhing in pain, had a normal range of motion in his neck and throughout his musculoskeletal system, no edema, and 5/5 bilateral lower extremity strength.  Tr. 596-97 (also noting a positive straight leg test).  In December 2012, Plaintiff continued to report low back, right leg, and neck pain, to Dr. Schrattenholzer's Physician's Assistant.  Tr. 578-580.

The ALJ noted Dr. Schrattenholzer's August 2011 exam, including that at that time, Plaintiff had a normal range of motion in his neck and his extremities, although he exhibited

tenderness.  Tr. 35.  The ALJ also noted that Plaintiff had a positive straight leg test, but his strength was 5/5 and he had no trouble walking up stairs.  Id.  Later, the ALJ summarized Dr. Schrattenholzer's Medical Source Statement opinions.  Tr. 37.  The ALJ gave Dr. Schrattenholzer's opinions little weight because he found that they were not consistent with the objective medical evidence.  Id.  The ALJ explained that the "doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact as limited as described."  Id.[2]

Plaintiff argues that the ALJ was "simply preposterous" in rejecting Dr. Schrattenholzer's functional limitation opinion because it was not based on "significant clinical and laboratory abnormalities."  Pl.'s Op. Br. at 19.  Plaintiff states that his spine and hips have significant degenerative spondylosis, and he has repeated nerve damage to his leg, arms, and hands.  Plaintiff points to his repeated surgical interventions as support.

An ALJ may properly reject a treating physician's opinion if it is unsupported by his or her own clinic notes and observations.  E.g., Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (discrepancy between physician's functional limitation and clinical notes and recorded observations was a clear and convincing reason to reject the physician's opinion).  Here, the only report by Dr. Schrattenholzer to mention Plaintiff's hip pain indicated that he was doing quite well and that his hip pain had been resolved after a total hip arthroplasty.  Tr. 395 (Mar. 10., 2008 chart note).  Dr. Schrattenholzer's other relevant chart notes from June and August 2011

---

[2]  The ALJ also suggested that Dr. Schrattenholzer had a bias and sympathy for Plaintiff, or that Plaintiff was demanding and insistent in seeking a supportive report, and that Dr. Schrattenholzer's opinion should be disregarded for these reasons.  Defendant concedes that the ALJ's speculation was not supported in the record.  Thus, I disregard this basis for rejecting Dr. Schrattenholzer's opinion.

and August 2012 indicate that Plaintiff complained of low back pain, but that he had no trouble walking up stairs, he was in no distress, he was not writhing in pain, he had normal musculoskeletal range of motion, although he had tenderness, his neck was supple, he did not have a sickly appearance, his August 2011 lumbar MRI showed moderate foraminal narrowing, he had a positive straight leg test, but his strength in both lower extremities was a 5/5, and he had equal deep tendon reflexes. Tr. 369-92, 591-98. While Dr. Schrattenholzer's chart notes, physical examinations, and observations could support some degree of limitation, the ALJ did not err in rejecting Dr. Schrattenholzer's severe limitations as being unsupported by his own clinical notes.

### 2. Dr. Oisin O'Neill, M.D.

Dr. O'Neill, a neurosurgeon, performed left L4-5 and left L5-S1 microdiskectomies and foraminotomies on Plaintiff on August 8, 2006. Tr. 513-14. In August 2009, Plaintiff returned to Dr. O'Neill because of neck and arm symptoms, including pain and numbness. Tr. 508-09. In reviewing his past medical history, Dr. O'Neill noted that Plaintiff had had no major medical history since he last saw Plaintiff except for the bilateral hip replacements to which Plaintiff had "good responses." Id. On physical examination, Dr. O'Neill noted that Plaintiff moved to and from the examining couch without difficulty, that his tone was normal in all four extremities, that he had 5/5 strength in his upper extremities except for his left upper extremity grip strength which was 10 pounds compared to the right which was 15 pounds. Id. There was no focal biceps or triceps weakness. Id. Dr. O'Neill advised Plaintiff he would need anterior cervical diskectomy and fusion at C5-6 and might also need posterior cervical intervention as well. Id. But, he recommended that he try an epidural steroid injection first. Id.

13 - OPINION & ORDER

On September 23, 2009, Dr. O'Neill performed a C5-6 anterior cervical diskectomy and C5-6 anterior cervical arthrodesis on Plaintiff.   Tr. 330-37.   The next month, Plaintiff reported he was doing well, with most of his arm pain gone and no more numbness in his right hand.   Tr. 504.   He still had a small amount of numbness in some digits of his left hand as well as some lingering neck pain.   Id.   Dr. O'Neill remarked that some low back pain Plaintiff had been experiencing had resolved.   Id.   In November 2009, Plaintiff reported to Dr. O'Neill that he was "delighted with his progress," as was Dr. O'Neill.   Tr. 502.

In December 2009, Dr. O'Neill wrote to Plaintiff regarding the results of EMG and nerve conduction studies he had performed earlier that month.   Tr. 501.   They showed evidence of an ulnar neuropathy at the left elbow.   Id.   Dr. O'Neill ordered additional cervical spine x-rays.   Id. Those x-rays showed some right intervertebral foraminal bony encroachment due to a kyphotic curve above the C6 level.   Tr. 500.   In February 2010, Dr. O'Neill opined that Plaintiff would need surgical decompression of the ulnar nerve on the left arm.   Tr. 498.   On July 20, 2010, Dr. O'Neill performed an ulnar nerve transposition on Plaintiff's left arm.   Tr. 340-45.   Post-operatively, Plaintiff did well, with significant improvement in his numbness and good range of motion.   Tr. 492.   His grip, biceps, and triceps strength were strong.   Id.   Dr. O'Neill described that the ulnar decompression surgery went "really well," with Plaintiff having an "excellent response" and "no issues at all."   Tr. 480.   At that point, Dr. O'Neill stated he needed to see Plaintiff only on "as needed" basis.   Id.

In August 2011, Plaintiff saw Dr. O'Neill again, this time for increasing leg pain.   Tr. 484-85.   Plaintiff reported "severe exacerbation of pain" in his legs, with minimal pain on the left and the majority of pain on the right.   Id.   Dr. O'Neill observed that Plaintiff was able to move to

and from the examining couch without difficulty, he had 5/5 strength in his upper and lower extremities, and his reflexes were generally 1+ in the upper extremities, 2- at the right knee, 1+ at the left knee, and absent at both ankles.[3] Id. His plantar responses were flexor bilaterally. Id. Light touch and pinprick examinations were normal, his range of motion was relatively normal, and his straight leg raise was negative. Id. In reviewing his MRI, Dr. O'Neill remarked that Plaintiff had mild to moderate foraminal stenosis at L4-5 on the right which could be the source of his right leg pain. Id.

Plaintiff had a lumbar CT myelogram done in late August 2011. Tr. 479-80. Dr. O'Neill reported to Plaintiff that it showed relatively severe degenerative arthropathy on both sides, some foraminal stenosis on the right at L4-5 and L3-4 and possibly some at L5-S1. Tr. 478. On October 5, 2011, Dr. O'Neill performed right decompression foraminotomies at right L3-4, right L4-5, and right L5-S1. Tr. 462-63. In his follow-up appointment later that month, Plaintiff told the Physician's Assistant at Dr. O'Neill's office that he was very pleased with the outcome of the procedure as he no longer had right leg pain. Tr. 458. He expressed surprise at the slow pace of his recovery but noted that he was definitely improving. Id. In November 2011, Plaintiff saw Dr. O'Neill who stated that Plaintiff "is doing quite well. He has had complete resolution of his leg pain. He is delighted with himself." Tr. 456. Dr. O'Neill again noted he would see Plaintiff again on an "as needed" basis. Id.

On October 27, 2011, a few weeks after Plaintiff's October 5, 2011 lumbar spine decompression foraminotomies, Dr. O'Neill completed a Medical Source Statement regarding the

---

[3] Plaintiff, citing a neurosurgery-related website, represents that deep tendon reflexes of 1+ are considered diminished. Pl.'s Op. Brief at 14 n.4.

nature and severity of Plaintiff's physical impairment.  Tr. 412-15.  There, he noted Plaintiff's recent surgery and the presence of post-surgical lower back pain.  Id.  He stated that Plaintiff's pain had not been completely relieved but it was tolerable.  Id.  In an 8-hour day, Dr. O'Neill opined that Plaintiff could sit for less than 20 minutes.  Id.  He further opined that in an 8-hour day, Plaintiff could stand/walk as tolerated.  Id.  In answer to the question of whether it would be "necessary or medically recommended for your patient not to sit continuously in a work setting," Dr. O'Neill answered no.  Tr. 413.  He believed that in an 8-hour workday, Plaintiff could occasionally lift 10 pounds or less, but could never lift 20 pounds or more.  Id.  He believed that Plaintiff had no significant limitations in repetitive reaching, handling, fingering, or lifting, other than the 10-pound limit he previously indicated.  Id.  Plaintiff did not need a cane or other assistive device while standing or walking.  Id.  His condition did not interfere with his ability to keep his neck in a constant position, unless he had to sit more than 20 minutes.  Id.  Dr. O'Neill was unable to determine at that time whether Plaintiff could perform a full-time competitive job requiring activity on a sustained basis.  Id.  He further opined that Plaintiff could not stoop, kneel, or bend, and that he could not push or pull more than 10 pounds.  Tr. 414.  Finally, he was unable to determine if Plaintiff would be absent from work as a result of his impairments.  Tr. 415.

In October 2012, Plaintiff returned to Dr. O'Neill for recurrent neck pain.  Tr. 563.  Dr. O'Neill remarked that Plaintiff stated his "back is doing great[.]"  Id.  Plaintiff denied leg or arm symptoms and his examination was "essentially normal" with good range of motion and no significant cervical muscle spasms.  Id.  Dr. O'Neill intended to obtain current cervical spine x-rays.  Id.  Dr. O'Neill ended up referring Plaintiff to Dr. Vladimir Fiks for C5-6 facet injections which Plaintiff had in November 2012.  Tr. 570-73.  In a November 30, 2012 report to Dr.

O'Neill, Dr. Fiks noted that Plaintiff failed to show for his follow-up appointment but that during a subsequent phone call, Plaintiff reported that he was doing well and did not see a need to return.  Tr. 573.

In his opinion, the ALJ noted Plaintiff's 2006 and 2011 back surgeries and his 2009 neck surgery.  Tr. 34.  He also discussed Plaintiff's October 2012 visit to Dr. O'Neill and that Plaintiff received the facet injections in November 2012.  Tr. 36.  However, the ALJ gave only "some weight" to Dr. O'Neill's October 27, 2011 Medical Source Statement regarding Plaintiff's limitations.  The ALJ explained that Dr. O'Neill's opinions were offered just after the lumbar decompression foraminotomy surgeries.  Id.  The ALJ remarked that on October 20, 2011, Plaintiff reported he was quite pleased with the outcome of the procedure, he no longer had right leg pain, and he was definitely improving.  Id.  And, the ALJ stated that in November 2011, soon after completing the Medical Source Statement, Dr. O'Neill reported that Plaintiff was doing "quite well," Plaintiff reported that his legal pain had completely resolved, and that Plaintiff was "delighted."  Id.

Plaintiff argues that the ALJ erred by giving Dr. O'Neill's opinion only "some weight." Plaintiff contends that the ALJ misstated Dr. O'Neill's opinion by focusing on limitations Dr. O'Neill did not give rather than on those he did.  Plaintiff contends that Dr. O'Neill never said that "he did not believe it necessary to recommend that the claimant not sit continuously in a work setting," and instead, Dr. O'Neill actually limited Plaintiff to sitting less than 20 minutes at a time.  Plaintiff notes further that Dr. O'Neill indicated that it was possible that Plaintiff's limitations would last 12 months or longer.  Plaintiff speculates that by noting this possibility, Dr. O'Neill indicated uncertainty about Plaintiff's post-surgery functionality given his pre-surgery

symptoms.  Plaintiff further speculates that Dr. O'Neill's comments about Plaintiff's post-surgery status "more likely" refer to a lack of infections and some relief from his leg pain.  Plaintiff contends the comment does not establish that Plaintiff was cured.  Thus, Plaintiff argues that based on the evidence as a whole, Dr. O'Neill's opinion "translates into an ability to do less than a full range of sedentary work."  Pl.'s Op. Br. at 20.

The ALJ's implicit determination that Dr. O'Neill's opinion reflected only a post-surgical status as to Plaintiff's recovery from surgery was reasonable.  The form asked for the date of first treatment which Dr. O'Neill reported as August 15, 2011 for "recent surgery."  Tr. 412.  In response to frequency of treatment, he stated "Post Surgery."  Id.  In response to the question asking him to list Plaintiff's primary symptoms, including pain, loss of sensation, fatigue, etc., Dr. O'Neill wrote: "Post Surgery: Back pain."  Id.  And, in response to the question asking him to list the nature and location of the pain, he wrote: "Post-surgical pain - lower back."  Id.

Plaintiff is incorrect that the ALJ misstated Dr. O'Neill's opinion.  According to the ALJ, Dr. O'Neill, in his October 27, 2011 Medical Source Statement, "said the claimant could sit for 20 minutes, but he did not believe it necessary to recommend that the claimant not sit continuously in a work setting."  Tr. 36.  The ALJ's statement is accurate because in the October 27, 2011 Medical Source Statement, Dr. O'Neill said that in an 8-hour day, Plaintiff could sit for less than 20 minutes.  Tr. 412.  It is not unreasonable to interpret that as a 20-minute limit. Notwithstanding that limit, Dr. O'Neill answered "No" to the question of whether it would be necessary or medically recommended that Plaintiff not sit continuously in a work setting.  Tr. 413.  The ALJ accurately reported Dr. O'Neill's statement.

Plaintiff offers conjecture as to the meaning and context of some of Dr. O'Neill's

18 - OPINION & ORDER

opinions.  Assuming these are reasonable inferences, they are not enough to establish that the ALJ erred.  The fact that Plaintiff offers one reasonable interpretation of the evidence does not by itself negate the reasonableness of the ALJ's interpretation.  "[I]f the evidence is susceptible to more than one rational interpretation, [the court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." Rounds v. Comm'r, 807 F.3d 996, 1002 (9th Cir. 2015) (internal quotation marks omitted).  Here, the ALJ's interpretation of Dr. O'Neill's opinion was reasonable and supported by the record.  He did not err by giving this opinion "some weight."

        3.  Dr. Duc Nguyen, D.O.

Dr. Nguyen was Plaintiff's primary care provider.  In November 2011, he remarked that he would complete paperwork for Plaintiff's disability application.  Tr. 417-18.  At that visit, Dr. Nguyen noted that Plaintiff complained of chronic neck and low back pain, increased pain with prolonged sitting of more than an hour, and that Plaintiff developed back pain after walking a short distance.  Tr. 417.  Plaintiff also reported that if he was not active, his pain was manageable.  Id.  At the end of the chart note for that visit, Dr. Nguyen wrote:

> I believe that Darren has suffered with pain for a long time and it is coming to the point of debilitation.  Althoug[h] with the recent low back surgery, he is able to manage his pain with just sulindac and gabapentin, any work requiring any amount of physical labor or work that requires any amount of sitting or standing, he will not be able to do as it exacerbates his pain.

Id.

Plaintiff argues that the ALJ erred by "completely ignor[ing]" Dr. Nguyen's opinion. Plaintiff is mistaken.  The ALJ noted the November 2011 visit with Dr. Nguyen and specifically mentioned Dr. Nguyen's comment that if Plaintiff was not active, his pain was manageable and

that prolonged sitting for more than an hour caused Plaintiff pain.  Tr. 35.  The ALJ also noted

that Dr. Nguyen remarked that Plaintiff had weaned himself off of all narcotic medications and

was taking only sulindac.  Id. (citing Tr. 417).

If Plaintiff's argument is that the ALJ failed to assign a specific weight to Dr. Nguyen's

opinion, the argument is valid.  However, I agree with Defendant that to the extent this is an

error, it is harmless.  First, as Defendant notes, Dr. Ngyuen's opinion was issued only four weeks

after Plaintiff's October 2011 back surgery and thus, like Dr. O'Neill's opinion, was most

probative of the immediate post-surgical recovery period.  In fact, only a couple of weeks later,

Plaintiff reported to Dr. O'Neill that he had complete resolution of his leg pain and was doing

quite well.  Tr. 456.  Second, to the extent Dr. Nguyen's opinion is one that Plaintiff is unable to

work (referring to the "point of debilitation"), the ultimate conclusion regarding disability is

reserved to the Commissioner.  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) (treating

physician's opinion on ultimate determination of disability is not binding on the ALJ);

Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) (same); 20 C.F.R. §§ 404.1527(d)(1)

416.927(d)(1) (final determination about a claimant's disability is reserved to the Commissioner).

Next, to the extent his opinion about Plaintiff's ability to perform work requiring physical

labor or "any amount of sitting or standing," is understood as a vocational opinion, it is similarly

not entitled to any weight.  McLeod, 640 F.3d at 885 ("A treating physician's evaluation of a

patient's ability to work may be useful or suggestive of useful information, but a treating

physician ordinarily does not consult a vocational expert or have the expertise of one"); Brekke v.

Comm'r, No. 1:12-cv-01699-HZ, 2013 WL 4647686, at *6 (D. Or. Aug. 29, 2013) (treating

physician's opinion limiting the claimant "to sedentary work was effectively a vocational rather

than a medical opinion" and thus, ALJ not required to give such an opinion controlling weight) (citing cases).

Finally, Dr. Nguyen's opinion was based on Plaintiff's subjective reporting, which the ALJ found not credible. Because this is a proper reason to reject a medical opinion, Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (ALJ did not err in rejecting opinions based on subjective complaints), any because, as discussed below, the ALJ did not err in his credibility finding, error by the ALJ in failing to discuss the weight he gave Dr. Nguyen's opinion, is harmless.

## II.  Plaintiff's Credibility

The ALJ is responsible for determining credibility.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  Carmickle v. Comm'r, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); see also Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility: First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's

testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  Id.

As the Ninth Circuit explained in Molina;

In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation.  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]  While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.]  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

Molina, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

After discussing much of the medical evidence, the ALJ remarked that Plaintiff alleged a "high degree" of limitations because of his impairments.  Tr. 37.  The ALJ acknowledged that some limitations were to be expected, but, he found that the record contradicted Plaintiff's testimony regarding the nature and extent of those limitations.  Id.  According to the ALJ, the record showed that Plaintiff continued to be capable of a range of unskilled light work.  Tr. 37-38.  The medical records did not support the alleged severity of his symptoms.  Tr. 38.

22 - OPINION & ORDER

In addition to rejecting Plaintiff's testimony based on the lack of supporting objective medical evidence, the ALJ found that Plaintiff's symptom testimony was inconsistent with his activities of daily living and his demeanor at the hearing.  Id.  He also found that Plaintiff stopped working for reasons unrelated to his alleged disabling symptoms.  Id.  Further, the ALJ noted that although Plaintiff alleged that he could not perform work-related tasks at a substantial gainful activity level after losing his job in March 2011, the medical records did not indicate a worsening of his condition after the amended alleged onset date of March 3, 2011.  Id.  Thus, the ALJ explained, a "reasonable inference is that the claimant's impairments did not prevent the performance of all work, since he has worked despite similar medical conditions."  Id.  Finally, the ALJ found that Plaintiff's use of medications did not suggest the presence of an impairment more limiting than those found by the ALJ.  Id.

First, ALJ's determination that Plaintiff's subjective testimony is not supported by the objective medical evidence was not in error.  Obviously, Plaintiff has had repeated surgeries. However, during the relevant time period beginning in March 2011, the objective medical evidence regarding his hip replacements showed no ongoing problems.  E.g., Tr. 358 (Aug. 2011 note by PA Jacoshenk stating leg length discrepancy was only one centimeter and his hips were fine); Tr. 406 (Aug. 2011 report by Dr. Thomas noting that x-rays showed hip replacements in good position); Tr. 560 (Oct. 2012 note by PA Jacoshenk that hip x-rays showed replacements in satisfactory alignment and "hip is not the issue").

As to his spinal impairments, the objective evidence for the relevant time period confirms Plaintiff has, as the ALJ found, severe impairments of the cervical and lumbar spine.  Tr. 30 (severe impairments include degenerative disk disease of the lumbar spine and status post

cervical fusion); see also e.g., Tr. 406 (Dr. Thomas noting that Plaintiff's MRI showed multilevel degenerative disk disease). But, the objective evidence does not support the level of disabling symptoms Plaintiff alleges. For example, in August 2011, PA Jacoshenk noted that Plaintiff's x-rays showed mild to moderate changes to his lower spine and facet joints. Tr. 358; see also Tr. 484-85 (Aug. 2011 note by Dr. O'Neill that Plaintiff's MRI showed mild to moderate foraminal stenosis). In response to Plaintiff's complaints of leg pain in August 2011, a CT myelogram showed severe degenerative arthropathy on both the right and the left and some foraminal stenosis. Tr. 484-85. To address the problem, Dr. O'Neill performed the decompression foraminotomies in October 2011, which Plaintiff said completely resolved the leg pain. Tr. 462-63, 458; see also Tr. 563 (Plaintiff reported to Dr. O'Neill in October 2012 that his back was "doing great"). Although Plaintiff again complained of neck pain in October 2012, Dr. O'Neill reported that Plaintiff denied leg or arm symptoms, his examination was "essentially normal," he had good range of motion, and he had no significant cervical muscle spasms. Tr. 563. Then, Plaintiff received facet injections from Dr. Fiks in November 2012 and reported back that he was doing well and saw no need to return.

Additionally, the December 2012 nerve conduction studies confirmed only mild carpal tunnel syndrome and were negative for ulnar neuropathy or cervical radiculopathy. Tr. 553-55. Finally, there is no evidence in the record that Plaintiff had any continuing foot problems after the December 2011 bunionectomy.

The ALJ's interpretation of the objective medical evidence was reasonable and based on substantial evidence in the record. The ALJ did not err in determining that Plaintiff's subjective symptoms were not supported by the objective medical evidence.

Second, as to the ALJ's personal observations at the hearing, the ALJ explained that
Plaintiff

> betrayed no evidence of pain or discomfort while testifying at the hearing. He sat
> during the entire hearing, and he walked in and out without any difficulty. While
> the hearing was short-lived and cannot be considered a conclusive indicator of the
> claimant's overall level of pain on a day-to-day basis, the apparent lack of
> discomfort during the hearing is given some slight weight in reaching the
> conclusion regarding the credibility of the claimant's allegations and the claimant's
> residual functional capacity.

Tr. 38.

Plaintiff contends that "credibility cannot be based on 'sit and squirm' jurisprudence."

Pl.'s Op. Br. at 23. In support, Plaintiff cites to Coats v. Heckler, 733 F.2d 1338 (9th Cir. 1984),

and Perminter v. Heckler, 765 F.2d 870 (9th Cir. 1985). In a 2013 Opinion, I explained that

> [i]n Coats, the issue was whether the ALJ improperly rejected a doctor's opinion
> because the claimant's "appearance and physical manifestations at the hearing
> belied her complaints of constant back and leg pain." 733 F.2d at 1340. The
> court held that the ALJ's reason was not sufficiently clear and convincing to reject
> the doctor's opinion. Id. Coats does not support Plaintiff's argument that the ALJ
> could not evaluate Plaintiff's credibility based on personal observations.

Toler-Dubanski v. Colvin, No. 3:12-cv-00973-HZ, 2013 WL 6018816, at *3 (D. Or. Nov. 11,

2013). In Perminter, the court held that the ALJ erred by denying benefits based on the ALJ's

observation of the claimant because the claimant's contrary statements were supported by

objective evidence. 765 F.3d at 872. As discussed above, the ALJ's finding in the instant case

that the objective medical evidence does not support Plaintiff's subjective limitations, is not in

error and thus, Perminter, like Coats, is not helpful to Plaintiff.

Both Social Security Rulings (SSR) and Ninth Circuit case law recognize than an ALJ

may consider "his or her own recorded observations of the individual as part of the overall

evaluation of the credibility of the individual's statements."  SSR 96-7p, available at 1996 WL 374186, at *5; Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (while ALJ's observations of claimant's functioning may not form the sole basis for discrediting claimant's testimony, they may be used in the "overall evaluation of the credibility of the individual's statements"); Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) ("Although this Court has disapproved of so-called 'sit and squirm' jurisprudence, the inclusion of the ALJ's personal observations does not render the decision improper.") (citation and internal quotation marks omitted).  Because the ALJ's observations of Plaintiff did not provide the only basis for discrediting his testimony, the ALJ did not err by including his observations in the credibility analysis.

Third, during the hearing, the ALJ confirmed that Plaintiff had been fired from his job as a truck driver because he hit someone while driving the truck.  Tr. 72 (citing Ex. 14F (Tr. 458)). In his decision, the ALJ noted that Plaintiff had a traffic accident while driving a truck on March 3, 2011, the amended alleged onset date, which Plaintiff had described as a "small accident" attributable to getting older and not being able "to be quick on your toes when driving."  Tr. 34; see also Tr. 268 (June 16, 2011 Adult Function Report where Plaintiff described being unable to keep a job he could perform because of his ADHD and "me getting older"; further commenting that "you need to be quick on your toes when driv[i]ng" which he "failed to do" on March 3rd when he had a "small accid[e]nt with the Big Rig" and was terminated).  Then, in explaining why Plaintiff's subjective limitation testimony was not entirely credible, the ALJ found that Plaintiff stopped working for reasons not related to his allegedly disabling impairments.  Tr. 38.

Plaintiff argues that the ALJ erred in this finding because Plaintiff explained that the accident was in part due to his inability to concentrate.  He contends that because he alleged that

26 - OPINION & ORDER

he suffered from ADHD and sleep apnea, the accident was in fact due to his disability.   While

Plaintiff offers explanations for the accident, it is undisputed that he was fired from his job and

that he did not leave the job voluntarily due to his perceived inability to continue.   Moreover, the

ALJ noted that psychological testing had revealed only a mild impairment in concentration and

attention and that the psychologist suggested only that it was possible he had ADHD.  Tr. 32

(citing Tr. 366).  The ALJ himself found Plaintiff's ADHD to be a non-severe impairment, a

finding Plaintiff does not challenge in this appeal.  Additionally, Plaintiff's sleep apnea, as the

ALJ discussed, was treated with a CPAP machine.  Tr. 33 (citing Tr. 355).  As of April 2010,

before the March 3, 2011 truck accident, Plaintiff reported to his primary care physician that the

CPAP machine had increased his mental alertness and physical well-being.  Id. (citing Tr. 430).

As a result, the ALJ found Plaintiff's sleep apnea to be a non-severe impairment, a finding

Plaintiff does not challenge here.  Considering the evidence in the record, the ALJ's finding that

Plaintiff's employment ended for reasons unrelated to his disability is not in error.

Fourth, the ALJ reasoned that because the medical records did not show that he had a

significant worsening of his condition after the March 2011 termination of his employment,

Plaintiff's impairments did not prevent the performance of all work because Plaintiff had

successfully worked before March 2011 under similar medical conditions.  Given the preceding

discussion affirming the ALJ's consideration of the medical evidence and the treating physicians'

opinions, I reject Plaintiff's suggestion that this finding was in error.

Fifth, the ALJ found that Plaintiff's daily activities were inconsistent with his allegations

of a disabling condition.  Tr. 38.  Specifically, the ALJ noted that Plaintiff "performed self-care

activities independently, shopped in stores, drove a car, fished, prepared meals, visited with

friends, watched television, attended church, and operated a computer.  In addition, he provided childcare services for his school age children." Id.

Plaintiff argues that the ALJ missed the "big picture" and took Plaintiff's responses to questionnaires out of context.  For example, Plaintiff states that while he said he "wipe[d] counter top, sweep floor, vacuum [sic], laundry, some mowing," he also qualified his abilities by stating that he doesn't "involve myself as much" and that he doesn't "fish, hunt or play sports any more."  Tr. 271, 273.  Plaintiff argues that a fair assessment of activities of daily living is not limited to just the occurrence of any activity but also considers the frequency with which it occurs, its duration, and the effects of performing that activity.  Plaintiff notes that as to walking, he walks one mile but only once per week, with breaks.  Tr. 65, 74.  He gave up hiking with the Boy Scouts and volunteering at his daughter's school because of difficulty bending and standing.  Tr. 66, 76.  As for fishing, he notes that he last did this in 2012.  Tr. 67.

In his 2011 Adult Function Report, Plaintiff stated that he spent the time from when he wakes up until he goes to bed engaged in the following activities:  starting the laundry, cleaning the kitchen counter top, making lunch and dinner, sometimes walking the dog, maybe doing errands around town, paying bills, getting dinner ready for his family, and folding clothes.  Tr. 269.  Activities he could no longer do included "do[]ing a lot more for the family like clean, play with them, camping," hiking, and mowing the yard.  Id.  As for meal preparation, he stated he could prepare sandwiches daily, spending up to one half-hour in preparation.  Tr. 270.  But, he added that there had been no changes in cooking habits since his condition began.  Id.  As to household chores, he stated, as he argues in his Opening Brief, that he wiped counter tops, swept floors, vacuumed, did laundry, and did some mowing.  Tr. 271.  He spent no more than one half-

hour on each item with the mowing once each week.  Id.  Laundry was done daily, with sweeping
and vacuuming done weekly.  Id.  He shopped in stores for no more than one half-hour for small
items, approximately once a week "if that."  Id.  He also read books and magazines, but indicated
he did not do these things well or often.  Tr. 272.  He spent time on the phone, went to Boy
Scouts and church weekly, and spent time on the computer.  Id.  His comment that he did not
"involve" himself as much as he used to was in response to a question related to changes in social
activities.  Id.

In an examination with psychologist Luke Patrick, Ph.D., in August 2011, Plaintiff
reported that he was "heavily involved with providing age-appropriate childcare for his
children[,]" and that he did laundry, dishes, food preparation, and "most other necessary
household responsibilities."  Tr. 365.  He also reported going to church and being involved with
the Boy Scouts.  Id.  Dr. Patrick noted that Plaintiff had struggles with mowing the lawn, "but
does it when he is feeling capable."  Id.  Dr. Patrick also noted that Plaintiff used to enjoy
building models and flying remote control airplanes, but these had "fallen by the wayside due to
recent disorganization of his garage."  Id.

Although the ALJ did not expressly acknowledge some of Plaintiff's testimony at the
hearing, and there is no doubt that Plaintiff has limitations, the ALJ did not err in concluding that
Plaintiff's activities are inconsistent with Plaintiff's assertions of completely disabling limitations.
Plaintiff's ability to assist with household chores, including sweeping and vacuuming, his
abilities to cook, to engage in some shopping, and to care for his school-aged children as well as
participate, even if not fully, with Boy Scouts and attend church regularly, suggest that his
functioning is not as impaired as alleged.  As expressed in Molina, even when a claimant's

everyday activities "suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  Molina, 674 F.3d 1113.

Finally, the ALJ also rejected Plaintiff's subjective symptom testimony because Plaintiffs' medications did not suggest the presence of an impairment more severe than the ALJ found in his decision.  Tr. 38.  Plaintiff makes no objection to this finding.

The ALJ gave clear and convincing reasons for rejecting Plaintiff's subjective limitations and symptom testimony.  Those reasons are supported by substantial evidence in the record.  The ALJ did not err in finding Plaintiff not entirely credible.

III.  Step Three Analysis Listing 1.04

At step three of the sequential analysis, the claimant has the burden of establishing the existence of an impairment or combination of impairments that meet or equal a listed impairment.  Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005).  Plaintiff argues that the ALJ erred by not finding him disabled under Listing 1.04 which relates to disorders of the spine.  20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04.  Plaintiff does not identify which of Listing 1.04's three subparts applies.  All three, however, initially require the presence of a spinal disorder such as spinal stenosis or degenerative disc disease, resulting in compromise of a nerve root or the spinal cord.  Id.  Listing 1.04 requires the additional satisfaction of subpart A, B, or C.[4]

---

[4]  I agree with Defendant that based on Plaintiff's arguments, Plaintiff relies on Listing 1.04A and 1.04C, but not 1.04B.  Further, while Plaintiff suggests that Listing 1.03 and Listing 11.14 apply to his hip joint limitations and carpal tunnel syndrome, Plaintiff cites these Listings only in his Reply Brief and I do not consider them.  E.g., Weaving v. City of Hillsboro, No. 3:10-cv-01432-HZ, 2012 WL 526425, at *15 n.5 (D. Or. Feb. 16, 2012) (refusing to consider argument raised for the first time in Reply Memorandum) (citing cases).

Under 1.04A, Plaintiff must establish:

Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Id., § 1.04A.  Under Listing 1.04C, Plaintiff must establish:

Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 100B2b.

Id., § 1.04C.  The definition of an inability to ambulate effectively means

an extreme limitation of the ability to walk; *i.e.* an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

Id., § 1.00B2(b)(1).

Plaintiff cites to the following evidence in support of his contention that he meets Listing 1.04A: (1) large disc herniation of L5-S1 with probable nerve root impingement and disk material protrusions at L4-5 and L3-4 in 2006; Tr. 455); (2) moderate disk degeneration at C4-5 with mild right and mild left foraminal stenosis, advanced disk degeneration at C5-6 with moderate canal stenosis at C5-6 with cord compression, and severe right and left moderate stenosis with presumed impingement of the right C5 nerve root, all in 2009; Tr. 392, 394, 448; (3) osteophytes resulting in mild canal stenosis and bilateral foraminal stenoses at L2-3 and L3-4 and a moderate left lateral protrusion compressing the L4 nerve along with a compressed nerves at L5 and L5-S1 in 2011; Tr. 389-83, 400).  Additionally, he contends there are numerous records

31 - OPINION & ORDER

showing his radiculopathy which he defines as neuro-anatomic pain, in both his cervical and

lumbar spine.  See Pl.'s Op. Br. at 14 (citing to record).  He cites positive straight leg tests,

diminished lower extremity sensation, and the diminishment or absence of reflexes in both upper

and lower extremities.  Id.

Plaintiff must establish four separate elements to meet Listing 1.04A:  (1) neuro-anatomic

distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated

muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and because there

is "involvement of the lower back," (4) positive straight-leg raising test both sitting and supine.

Defendant concedes that several references to Plaintiff's radiculopathy indicate evidence of the

first element of neuro-anatomic distribution of pain.[5]  But, Defendant argues that Plaintiff fails to

show limited motion of the spine, motor loss, or positive straight leg raises in both positions.

Defendant cites to several references to Plaintiff's full range of spinal motion.  Tr. 382 (June 27,

2011, Dr. Schrattenholzer); 375 (Aug. 5, 2011, Dr. Schrattenholzer); 597 (Aug. 7, 2011, Dr.

Schrattenholzer); 484 (Aug. 15, 2011, Dr. O'Neill); 458 (Oct. 20, 2011, Physician's Assistant in

Dr. O'Neill's office); 589 (Nov. 8, 2012, Physician's Assistant in Dr. Schrattenholzer's office);

580 (Dec. 4, 2012, Physician's Assistant in Dr. Schrattenholzer's office).  Plaintiff points to no

contrary range of motion evidence in his Reply Brief.  Although Dr. Thomas's August 16, 2011

consultative examination report indicated that Plaintiff had less than the full range of motion of

both the cervical and lumbar spine on that date, Tr. 406, the multiple examinations by treating

practitioners in this relevant time period establish that Plaintiff did not have ongoing limitations

---

[5]  However, some courts have found that radiculopathy is not equivalent to the
requirement of neuro-anatomic distribution of pain.  E.g., Smick v. Comm'r, No. CIV.
GLR-14-2955, 2015 WL 4092449, at *2 (D. Md. July 6, 2015).

in range of motion.

Defendant also cites to the numerous references in the record to Plaintiff's full muscle strength, measured at 5/5. Tr. 375 (Aug. 5, 2011, 5/5 bilateral lower extremities, Dr. Schrattenholzer); 484 (Aug. 15, 2011, 5/5 strength in upper and lower extremities, Dr. O'Neill); 597 (Aug. 7, 2012, 5/5 bilateral lower extremities, Dr. Schrattenholzer); 589 (Nov. 8, 2012, 5/5 bilateral lower extremities, Dr. Schrattenholzer's Physician's Assistant); 580 (Dec. 4, 2012, 5/5 bilateral lower extremities, Dr. Schrattenholzer's Physician's Assistant); see also Tr. 406 (Aug. 16, 2011 report of Dr. Thomas noting 5/5 strength in hip flexors, hip ab-adductors, quadriceps, and hamstrings, bilaterally, as well as in ankle dorsiflexors, great toe dorsiflexors, ankle invertors, evertors, and plantar flexors, and in the biceps, triceps, pronators, supinators, wrist flexors, wrist extensors, and the ulnar and median intrinsics bilaterally; further noting that calf circumference was equal bilaterally).

Plaintiff correctly notes that there is an occasional reference to diminished lower extremity sensation and some diminished or absent reflexes. Tr. 484 (Aug. 15, 2011, diminished reflexes in upper extremities and left knee, absent reflexes at ankles, Dr. O'Neill); Tr. 406 (Aug. 16, 2011 report by Dr. Thomas noting zero reflex to ankle on the left and decreased sensation to the lateral aspect of the right foot). But, Listing 1.04A is clear that Plaintiff must show "motor loss" accompanied by sensory or reflex loss. Showing the sensory or reflex loss by itself is not enough.

Finally, as to straight leg testing, Plaintiff asserts that he has had positive straight leg raising tests on a number of occasions. Pl.'s Op. Br. at 14. However, only two of those occasions occurred in the relevant time period. Tr. 358 (July 26, 2011 note of positive seated straight leg

raise); Tr. 406 (Aug. 16, 2011 report noting "[s]traight leg raising right 60 [degrees] with back

pain on dorsiflexion test and left 45 [degrees] with back pain on dorsiflexion test.  Straight leg

raising sitting is 80 [degrees].").[6]

Defendant argues that the record fails to show positive straight leg testing for both sitting

and supine as required by Listing 1.04A.  Plaintiff does not dispute this assertion in his Reply

Brief, or dispute that he also had negative straight leg tests in the relevant time period.  E.g., Tr.

484 (Aug. 15, 2011).

Given that the record does not support a finding of limitations in range of motion,  motor

loss, or positive straight leg raising in both sitting and supine positions in the relevant time

period, the record does not support a finding of the required nerve root compression as delineated

by the four elements in Listing 1.04A.  Thus, the ALJ did not err in concluding that the medical

evidence did not demonstrate the "required nerve root compression[.]" Tr. 33.

Listing 1.04C requires an inability to ambulate effectively, defined to mean "an extreme

limitation of the ability to walk" and generally "having insufficient lower extremity functioning .

. . to permit independent ambulation without the use of a hand-held assistive device(s)[.]"

Examples of ineffective ambulation include

> the inability to walk without the use of a walker, two crutches or two canes, the
> inability to walk a block at a reasonable pace on rough or uneven surfaces, the
> inability to use standard public transportation, the inability to carry out routine
> ambulatory activities, such as shopping and banking, and the inability to climb a
> few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Part 404, Subpt. P, App. 1, § 100B2(b)(2).

Plaintiff has spinal stenosis and there is some evidence of "neuroclaudication[.]" Tr. 380.

_____

[6]  Plaintiff failed to cite to another positive straight leg test in August 2012.  Tr. 597.

However, he was not having any trouble walking up stairs at the time, Tr. 381, and both Dr. O'Neill and Dr. Schrattenholzer stated that Plaintiff did not need a cane or other assistive device when walking.  Tr. 413, 557.  The record supports the ALJ's conclusion that there was insufficient evidence of Plaintiff's inability to ambulate effectively, as that term is defined by the regulations.

The ALJ determined that the record did not establish that Plaintiff's impairments met or *medically equaled* a listed impairment.  Tr. 33-34.  Other than the arguments Plaintiff makes about meeting a listed impairment, Plaintiff's contention that the record shows that his impairments *equal* a listed impairment is vague.  He does not set out a specific contention about what combination of impairments equal which listing.  For example, he argues that he "suffers from widespread degenerative disease affecting his entire spine, and has required repeated surgeries."  Pl.'s Op. Br. at 14; see also id. at 13 (same).  He states that his spinal problems have continued despite repeated surgical interventions.  He contends he has never had complete resolution of his symptoms.  And, in his Reply Brief, he points to his painful hips, a leg length discrepancy that caused altered gait and required therapy, bilateral arm pain and weakness, hearing loss, and tinnitus.  But, while Plaintiff argues that the ALJ failed to fully discuss these impairments, it is Plaintiff's burden to establish that the medical evidence shows that his impairments equal a listed impairment.  Saying it is so is insufficient.  See Burch, 400 F.3d at 683 ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence.").

Moreover, Plaintiff does not challenge the ALJ's step two findings regarding severe and

non-severe impairments and makes no argument that the ALJ erred by failing to discuss hearing loss or tinnitus at step two. Thus, it appears that Plaintiff does not suggest that the hearing loss or tinnitus was a severe impairment or an impairment at all. And, in any event, the ALJ accounted for the hearing loss in his RFC. Furthermore, the ALJ discussed the July 26, 2011 report regarding the leg length discrepancy. Tr. 35 (citing Tr. 358). As explained above in the section discussing the medical evidence, Plaintiff told PA Jacoshenk that a podiatrist had told him he had "lost an entire inch" on his right side, suggesting this was caused by his hip surgery. Tr. 358. But, the x-rays confirmed that his left leg was only "slightly longer" than his right, by just one centimeter. Id. Plaintiff reported that he had been doing pool therapy which had been helping, and his complaint was back pain caused, he thought, by the leg length discrepancy. Id. On physical examination, his hips were fine, there was no muscle atrophy, he had a nonantalgic gait, and intact neurovascular supply to the right lower extremity. Id. Although he had a positive seated straight leg raise, the issue did "not appear to be coming from his hips, as his x-rays and exam are negative." Id. This evidence fails to establish any basis for "equivalence" to a listed impairment based on a continuing hip problem or leg length discrepancy.

Finally, the alleged bilateral arm pain and weakness has been addressed above. Plaintiff continued to have 5/5 upper extremity strength. After receiving the facet injections from Dr. Fiks in November 2012, Plaintiff reported he was doing well. Thus, these symptoms provide no basis for meeting or equaling a listed impairment, when considered alone or in combination with his other impairments. The ALJ did not err at step three by concluding that the medical evidence failed to establish that Plaintiff's impairments, alone or in combination, met or equaled a listed impairment.

36 - OPINION & ORDER

IV.  Obesity

At step two, the ALJ found Plaintiff's obesity to be a severe impairment because in combination with his other impairments, it significantly limits, but does not preclude, his ability to do basic work activities.  Tr. 31.  At step three, the ALJ explained the medical criteria established by the National Institutes of Health (NIH) for the diagnosis of obesity based on body mass index (BMI).  Tr. 33-34.  According to those criteria, based on Plaintiff's height and weight, Plaintiff's BMI was 38.9, placing him in the "obesity" category for the relevant time period.  Tr. 34.  The ALJ noted that the NIH criteria for BMI levels did not correlate to specific functional losses.  Id.  The ALJ explained that although obesity is no longer a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, he considered the effects of Plaintiff's weight and BMI of 38.9 in reducing his RFC.  Tr. 34 (citing SSR 02-1p, available at 2002 WL 35686281).

Plaintiff argues that the ALJ failed to consider the impact of Plaintiff's obesity at step three, on Plaintiff's credibility, and on the RFC.  Plaintiff relies on SSR 02-1p which discusses the analysis of obesity at step three.  SSR 02-1p at *5.  The Social Security Administration (SSA) finds that a claimant meets the requirements of a listing if the claimant has another impairment that by itself meets the listing or if there is an impairment that, in combination with obesity, meets the listing.  Id.  For example, "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing."  Id. (noting this is especially true of musculoskeletal, respiratory, and cardiovascular impairments).

The regulation further provides that the SSA may find obesity, by itself, to be medically equivalent to a listed impairment.  Id.  The example provided is where the obesity is of such a

level that it results in an inability to ambulate effectively, as defined in section 1.00B(2)(b) of the listings.  Id.  Obesity may also combine with other, multiple equivalents, to establish equivalence to a listing.  Id.  As an example, the regulation explains that because obesity affects the cardiovascular and respiratory systems, it is harder for the chest and lungs to expand, making the respiratory system work harder to provide oxygen which in turn places additional work on the heart.  Id.  "Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected."  Id.  Thus, the SSR continues, the SSA "may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings."  Id.

Finally, the regulation makes clear that the effect of obesity is an individual determination with "each case based on the information in the case record."  Id. at *6.  The SSA does "not make assumptions about the severity or functional effects of obesity combined with other impairments."  Id. (noting further that obesity "in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.").

Here, the ALJ acknowledged Plaintiff's obesity in his step three discussion and impliedly concluded that either alone or in combination with Plaintiff's other impairments, the obesity did not meet or equal a listed impairment.  Instead, he considered obesity in assessing Plaintiff's RFC.  SSR 02-1p does not require more where, as here, Plaintiff does not cite to substantial evidence in the record establishing that his obesity limits his functioning.  The only mention by a treating physician of a symptom directly related to obesity is a single occasion in the spring of 2010 when Dr. Nguyen remarked that Plaintiff's lower extremity edema and shortness of breath

38 - OPINION & ORDER

was likely related to his obesity and in particular, his recent twenty-pound weight gain. Tr. 430 (Apr. 6, 2010 chart note); Tr. 429 (Apr. 16, 2010 chart note). This occasion predates the alleged onset date and has little relevance to Plaintiff's post-onset date condition, especially because by the time he applied for disability benefits, his weight was back down to 295 and at the hearing he weighed 280 pounds. Tr. 245 (May 20, 2011 Adult Disability Report stating weight was 295); Tr. 52 (June 14, 2013 hearing testimony that weight was 280). The record shows that Plaintiff's weight steadily increased in the fall and spring of 2009-2010, but then went back down. Tr. 305 (Sept. 2009, 305 pounds); Tr. 447 (Feb. 2010, 310 pounds); Tr. 331 (March 2010, 331 pounds); Tr. 383 (May 2010, 324 pounds). The record does not show any continuing role of obesity in causing edema or shortness of breath.

While many providers note Plaintiff's weight, there is no medical record evidence as to whether or how the obesity has exacerbated or contributed to Plaintiff's condition or limitations within the relevant time period or on any continuing basis. On appeal to this Court, Plaintiff, in his Reply Brief, cites to a wikipedia entry and to an arthritis website suggesting that excess weight puts extra pressure on joints, increases pain and stiffness, and decreases the ability to move. Even accepting these sources as reliable, a general statement about the effects of obesity on arthritis-related conditions does not establish any functional limitations for Plaintiff.

Without such evidence in the record, the ALJ did not err in failing to discuss Plaintiff's obesity at greater length at step three. Furthermore, the ALJ discussed Plaintiff's credibility at some length, and for the reasons explained above, the credibility determination was not in error. The ALJ did not err in failing to expressly discuss the impact of Plaintiff's obesity on Plaintiff's alleged limitations when making his credibility determination. Finally, the ALJ stated he took

Plaintiff's obesity into consideration in reducing his RFC.

Plaintiff suggests that the ALJ's RFC limiting Plaintiff to light work is inconsistent with his obesity. However, the RFC is otherwise supported by the medical record. Also, the ALJ did not err in finding Plaintiff not credible and in rejecting the opinions of the treating physicians. And, as further discussed below, the ALJ did not err in consideration of the lay witness testimony. With no other errors, Plaintiff's simply citing to his obesity is not a sufficient basis to demonstrate that the ALJ failed to consider Plaintiff's obesity in determining his RFC, especially in light of the ALJ's affirmative representation that he considered Plaintiff's obesity in formulating Plaintiff's RFC.

V. Lay Witnesses

Two lay witness statements are in the record. In the first, Plaintiff's former supervisor wrote in October 2007 that Plaintiff could not lift more than 20 pounds and thus, could not carry or move most of the items at a construction site. Tr. 230. He was unable to climb, bend, or twist. Id. These limitations prevented him from performing the typical duties of a drywall finisher, the job Plaintiff had at that time. Id. The ALJ did not mention this testimony.

In the second statement, Plaintiff's wife wrote in June 2011 that Plaintiff had a large amount of pain, hearing problems, and problems with concentrating for extended periods of time because of "ADD." Tr. 276. She wrote that he was hard to get along with, was easily overwhelmed, and did not handle change well. Tr. 277. She stated that he could not bend or sit for long periods of time because he becomes stiff. Id. She wrote that Plaintiff cared for their children, fed their pets, sometimes walked the dog, and had no problems with personal care such as dressing, bathing, etc. Tr. 278. He also cooked meals daily, spending from 1-2 hours

preparing dinner and 30 minutes preparing lunch.  Tr. 279.  She indicated he had limitations in

bending, and that while he could mow, it caused him trouble moving the next day.  Tr. 279.  He

did the laundry.  Id.  He was able to drive a car, walk, and use public transportation.  Tr. 280.  He

shopped in stores for "minor" groceries, clothes, and household items.  Id.  He shopped anywhere

from 1-2 hours depending on whether it was a bad week or a good week, and up to 3 times per

week in a good week.  Id.

Plaintiff's wife explained that Plaintiff was no longer able to be as active as he used to be

because of his back or his hips.  Tr. 281.  He no longer played sports and could not walk or hike

much.  Id.  He was able to participate in church or other social groups two to four times per

week.  Id.  She wrote that Plaintiff could walk three blocks before needing to stop and rest for

five minutes.  Tr. 282.  Although the ALJ summarized Plaintiff's wife's statement, he did not

assign it any particular weight.  Tr. 35.

Plaintiff argus that the ALJ erred by failing to assign weight to both lay witness

statements.  Plaintiff cites to Stout v. Commissioner, 454 F.3d 1050 (9th Cir. 2006) as support.

There, the Ninth Circuit suggested that an ALJ errs by failing to comment on such testimony.  Id.

at 1053 ("In determining whether a claimant is disabled, an ALJ must consider lay witness

testimony concerning a claimant's ability to work. . . . . [L]ay testimony as to a claimant's

symptoms or how an impairment affects ability to work *is* competent evidence and therefore

*cannot* be disregarded without comment.") (internal quotation marks and citation omitted) (italics

in Stout).

However, the Ninth Circuit later clarified that Stout did not create a per se rule that

whenever an ALJ fails to comment on a lay witness's testimony, the error requires reversal.

41 - OPINION & ORDER

Molina, 674 F.3d at 1117.  Instead, Stout's holding was consistent with the Ninth Circuit's

harmless error analysis, and thus, "[w]here lay witness testimony does not describe any

limitations not already described by the claimant, and the ALJ's well-supported reasons for

rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be

inconsistent with our prior harmless error precedent to deem the ALJ's failure to discuss the lay

witness testimony to be prejudicial per se."  Id.

      Here, any errors by the ALJ in failing to mention Plaintiff's supervisor's statement or in

failing to assess a particular weight to Plaintiff's wife's statement, are harmless.  The supervisor's

statement was made three and one-half years before Plaintiff's alleged onset date.  The ALJ may

properly reject evidence which predates the relevant period because it is not probative of the

claimant's functional limitations during the relevant time.  E.g., Farley v. Astrue, No.

3:09-cv-01211-BR, 2011 WL 653895, at *4 (D. Or. Feb. 14, 2011) (agreeing with Defendant that

the ALJ "may reject evidence that predates the relevant period") (citing Carmickle v. Comm'r,

533 F.3d 1155, 1165 (9th Cir. 2008); Burkhart v. Bowen, 856 F.2d 1335, 1340 n.1 (9th Cir.

1988)); see also Tobeler v. Colvin, 749 F.3d 830, 833 (9th Cir. 2014) ("Evidence is relevant

when it has 'any tendency to make a fact more or less probable than it would be without the

evidence.'") (quoting Fed. R. Evid. 401(a)); McCray–Keller v. Colvin, No. 2:12–cv–674–EFB,

2013 WL 5467201, at *7 (E.D. Cal. Sept. 30, 2013) ("Given that these records pertain to

behavior well before plaintiff's alleged onset date, they are not probative evidence of plaintiff's

functional impairments at the time she allegedly became disabled.").

      As to Plaintiff's wife's statement, under Molina, the ALJ's error in failing "to comment

upon lay witness testimony is harmless where the same evidence that the ALJ referred to in

discrediting [the claimant's] claims also discredits [the lay witness's] claims." 674 F.3d at 1122

(internal quotation marks omitted; brackets in original).  Here, the ALJ rejected Plaintiff's

testimony regarding his subjective symptoms because it was not supported by the objective

medical evidence, was inconsistent with his activities of daily living, was inconsistent with the

fact that his last job ended for reasons unrelated to his disability, and was inconsistent with the

level of pain medications he was taking.  This same evidence equally discredits Plaintiff's wife's

lay testimony.  Thus, any error in failing to assign weight to that testimony was harmless.

Molina, 674 F.3d at 1122 (ALJ's error in failing to explain reason for rejecting lay testimony was

"inconsequential to the ultimate nondisability determination in the context of the record as a

whole" and thus was harmless when the testimony did not describe any limitations beyond those

the claimant herself described, and which the ALJ had rejected for clear and convincing reasons)

(internal quotation marks omitted).

VI.  RFC

     Plaintiff argues that the ALJ's RFC was inadequate because it failed to include several

limitations Plaintiff attributes to his various impairments.  He contends that the ALJ ignored the

weight of the evidence supporting a finding that Plaintiff was unable to do a full range of

sedentary work.  He suggests that the evidence supports that *at best*, Plaintiff should be limited to

less than a full range of sedentary work due to pain.

     I agree with Defendant that this argument is essentially a restatement of Plaintiff's prior

arguments, particularly his arguments regarding the ALJ's credibility finding and his rejection of

the treating physicians' opinions.  Thus, the argument does not need to be separately addressed.

Additionally, I add that although the ALJ's RFC limited Plaintiff to light work, in his alternative

step five finding, the ALJ noted that he asked the VE at the hearing about the existence of jobs

for an individual who was limited to sedentary work. Tr. 41. The VE testified that a sedentary

limitation would eliminate all past work, but there still would be jobs the hypothetical individual

could perform such as surveillance system monitor, addresser, and charge account clerk. Tr. 86-

87. Thus, even if the ALJ erred in a determination that Plaintiff could perform light work, he

made an alternative finding that Plaintiff could perform sedentary work and then relied on the

VE's testimony to conclude that Plaintiff could perform other work which exists in the national

economy. Thus, the RFC, and the ALJ's ultimate disability determination, was not in error.

CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.


Dated this ____8____ day of _____March_____ , 2016



_____
Marco A. Hernandez
United States District Judge